## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| AZANIAH BLANKUMSEE, # 326-698 | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No.  PWG-15-3495 |
| | * | |
| RICHARD GRAHAM, JR., Warden of WCI, | * | |
| DENISE GELSINGER, Ass't Warden, | * | |
| CARLA BUCK, R.N., (Registered Nurse) | * | |
| LT. MERLING (PHILIP), | * | |
| OFC. R. HEAVENER, | * | |
| OFC. Z. FRAZEE, | * | |
| CAPT. TICHNELL, | * | |
| | * | |
| Defendants. | * | |
| | *** | |

### <u>MEMORANDUM OPINION</u>

After Azaniah Blankumsee, a prisoner at Western Correctional Institution ("WCI"), refused what he perceived to be an unwarranted strip search, he was placed, naked, in an isolation cell for two days and his property was seized.  An x-ray revealed that he did not, as had been suspected, have contraband in a body cavity, and he was released from isolation but housed on a new tier.  He filed suit, *pro se*, pursuant 42 U.S.C. § 1983, claiming that the ordeal violated his constitutional rights and resulted in a loss of property.  ECF No. 1. Defendant Carla Buck, R.N., by her counsel, has filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment and Memorandum in Support. ECF Nos. 14, 14-3.  Blankumsee filed an Opposition, ECF No. 16, and Buck filed a Reply, ECF No. 21.  Warden Richard J. Graham, Jr., Assistant Warden Denise Gelsinger, Captain Robert P. Tichnell, Lieutenant Philip D. Merling, C.O. II Reginald M. Heavener, and C.O. II Zackary D. Frazee (collectively, the "State Defendants"), by their counsel, filed a separate Motion to Dismiss or, in the Alternative, Motion for Summary

Judgment and Memorandum in Support. ECF Nos. 27, 27-2.  Blankunsee filed an opposition in the form of a declaration.  Pl.'s Decl., ECF No. 36.  The State Defendants have not filed a reply, and the time for doing so has passed.  *See* Loc. R. 105.2(a).

No hearing is necessary to resolve the matters pending.  *See* Local Rule 105.6 (D. Md. 2016).  For the reasons that follow, Defendant Buck's motion, treated as a motion for summary judgment, will be denied without prejudice, and the State Defendants' motion, also treated as a motion for summary judgment, will be granted.

## BACKGROUND

Azaniah Blankumsee claims that on August 2, 2015, for "no apparent reason," Officers Heavener and Frazee "singled [him] out of a crowd of 5 to 6 inmates" for a strip search.  Compl. 3.  Blankumsee was escorted to a room and complied with the officers' command to strip.  *Id.*; Aug. 2, 2015 Notice of Inmate Rule Violation ("8/2/15 Notice"), State Defs.' Mem. Ex. 3, ECF No. 27-6. He claims that when he gave Frazee his shoes, "Frazee ripped the soul [sic] out of them" and told Blankumsee that he ripped out the soles "cause [he] want[ed] to."  Compl. 3; Pl.'s Decl. 10.

Blankumsee was directed "to bend at the waist and spread his buttocks." 8/2/15 Notice; Compl. 3.  Frazee told him that the officers would "look inside of [his] asshole." Compl. 3.  He initially refused but eventually bent over, although he still "refuse[d] to spread his buttocks." 8/2/15 Notice. Officer Heavener "noticed a blue glove type material located in his anal cavity." *Id.*; Frazee Decl. ¶ 2, State Defs.' Mem. Ex. 1, ECF No. 27-4; Heavener Decl. ¶ 2, State Defs.' Mem. Ex. 2, ECF No. 27-5.   Blankumsee recalled that he "explained to them [that he] was very uncomfortable with their behavior," and he asked to see a sergeant. Compl. 3. According to Blankumsee, at that point, Officer Heavener "falsely advised Sgt. Miller that [Blankumsee] had a

blue glove type material in [his] buttocks." *Id.*; Pl.'s Decl. 10.  Lieutenant Philip Merling arrived, and, according to Blankumsee, "threatened to have his [officers] hold [Blankumsee] down and retrieve whatever was in [his] buttocks." Compl. 3.  Lt. Merling denies this accusation.  Merling Decl. ¶ 3, State Defs.' Mem. Ex. 4, ECF No. 27-7.

Blankumsee told them there was nothing in his body cavity, but he was escorted to Special Observation Housing ("SOH"), where Lt. Merling told Nurse Buck "to approve of [him] being placed in an isolation cell." Compl. 3.  According to Blankumsee, Buck asked Lt. Merling what he "want[ed] the report to say," and Lt. Merling responded: "Make something up." *Id.*  Lt. Merling also denies this accusation.  Merling Decl. ¶ 3.  Blankumsee maintains that Nurse Buck asked: "Who's gonna go in his ass?" to which Merling allegedly responded: "Not me." *Id.* Blankumsee's medical records show that his wellness check on August 2, 2015 was normal and he was approved on that day for SOH placement. Aug. 2, 2015 Med Rec., ECF No. 14-4.

Blankumsee claims that he "was placed in an isolation cell <u>naked</u>, with <u>no bed</u>, <u>no water</u>, [a] <u>non[]functional toilet</u>, [and] <u>no food</u> for over 48 hours, while the air conditioner was turned up very high." Compl. 3; Pl.'s Decl. 9.  Blankumsee states that Captain Tichnell "came to speak with [him]" while he was in the isolation cell, and told him that "until [he] compl[ied] and g[a]ve up whatever [he] had, [he would] continue [to be housed] under these conditions." Compl. 3; Pl.'s Decl. 9.  Tichnell asked Blankumsee "to agree to a full body x-ray."  Compl. 3; Tichnell Decl. ¶ 3, State Defs.' Mem. Ex. 5, ECF No. 27-8.  Blankumsee agreed to the x-ray, and the results showed that he did not have any contraband inside him. Compl. 3; *see* Tichnell Decl. ¶ 3. Tichnell told him that he "would be going to segregation" because he was "written an adjustment [rule violation] for refusing a search," and he had a hearing pending on that violation. Tichnell Decl. ¶ 3; Compl. 4.

Blankumsee claims that he "suffered from multiple panic[] and anxiety attacks" while in the isolation cell, and he alleges that "the inmates assigned to watch/observe [his] movements attempted to get the [officers] to assist [him], by contacting [the] medical [department], and/or, to provide [him] with clothing," but the officers stated that they "were given orders to do nothing." Compl. 4.   Blankumsee claims that on August 3, 2015, four prison employees (not named as defendants in this case) were allowed to observe Blankumsee "naked for long periods of time." *Id.*   Blankumsee states that on August 4, 2015, his clothing was returned to him after the x-ray revealed that he "did not have anything illegal in [his] body," and he was escorted to Housing Unit (HU) #4. *Id.*

He asked for his property, which had been seized when he went to SOH, and eventually it was returned, except that some of his property was "missing."   Compl. 4.   Specifically, he declares that he lost sentimental photographs of his deceased mother and legal transcripts.   Pl.'s Decl. 10–11.   L. Tennille Winters, a WCI case manager, stated that, because Blankumsee was placed on SOH for failing to comply with a strip search on August 2, 2015, "his property was packed and inventoried by correctional officers" while he was not present.   Winters Decl. ¶ 6, ECF No. 27-10.   On August 4, 2015, Blankumsee's "property was inventoried in his presence when he was removed from SOH and placed in HU #4."   *Id.*   According to Winters, "Blankumsee signed both the August 2, 2015 and the August 4, 2015 Personal Property Inventory sheets verifying that he checked the . . . list of personal property and agreed that all of the items are his and consist of all of his property."   *Id.*

On HU #4, Blankumsee was placed in "Cell 4A-27-B, where the windows were bolted shut," and housed there for more than two weeks. Compl. 4; Winters Decl. ¶¶ 4, 5.   He asserts that he was "subjected to extreme hot temperatures for the 14 days" and had trouble breathing.

Pl.'s Decl. 9.  Winters explained that the windows "have been bolted shut un order to prevent segregation inmates from yelling to general population inmates on the compound," and that "[a]ll cells are equipped with a ventilation system."  Winters Decl. ¶ 5.

Blankumsee alleges that he filed multiple Administrative Remedy Procedure ("ARP") requests, all of which Assistant Warden Gelsinger dismissed.  Compl. 4.  Blankumsee alleges that Gelsinger told his siblings that he was placed in a "mental patient hospital," not an isolation cell. *Id.* at 4–5.  Blankumsee claims that Assistant Warden Gelsinger hung up on his sister Khalilah Blankumsee when "confronted with facts." *Id*. at 5.

Blankumsee alleges that since filing ARP requests, he has been subjected to retaliation and discrimination. Compl. 5.  When Blankumsee was removed from disciplinary segregation status on August 19 or 20, 2015, after the hearing on his rule violation, he was "moved into Cell 3C32B" on HU #3 "in accordance with WCI ID 230-004.1 Appendix 2 (WCI Housing Unit Level System Plan) Section III.  Winters Decl. ¶ 7; *see* Compl. 5.  He claims that he was discriminated against in HU #3 by being "denied the same rights, privileges, and civil rights as all other inmates in [the general ] population, such as activities, recreation, library, [and] law library." Compl. 5.  Blankumsee states that he was also denied participation in jobs and programs to earn diminution of confinement credits, "there[by] subjecting [him] to a prolonged confinement." *Id*.  According to Winters, inmates on HU #3, including Blankumsee, had "modified" movement.  Winters Decl. ¶ 7. She asserted that Blankumsee was "allowed more than the require[d] amount of recreation, along with library privileges, [and] inmate job opportunities." *Id.*

Blankumsee moved to cell 3A26B on October 20, 2015.  Winters Decl. ¶ 7.  He claims that on October 26, 2015, during the 8-4 shift, he "was singled out of a rec[reation] hall full of

other inmates, and aggressively stripped," and his "cell was searched and left [in] disarray." Compl. 5. According to Winters, "[t]here is no record in the Strip Search Log of Mr. Blankumsee being strip searched on October 26, 2015 nor is there any record in the cell Search Log of [Blankumsee's] cell being searched on October 26, 2015," and he "did not file an Administrative Remedy Procedure" regarding either alleged search. Winters Decl. ¶ 8. He also alleges that on October 27, 2015, Officer Cartwright "placed [him] in an isolation cell for over one hour," and that same day, Sergeant Lasher[1] asked him: "How does your ass feel?" Compl. 5. Blankumsee maintains that "these adverse actions are . . . a direct result of [him] exercising his protected conduct and will continue, or get worse if [he is] not removed from [WCI and/or the] region immediately." *Id.* As redress, Blankumsee requests monetary damages, his property or its monetary value, punitive and compensatory damages, and injunctive relief and his transfer out of the Cumberland region. *Id.* at 3.

## STANDARD OF REVIEW

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10

---

[1] Blankumsee did not name Cartwright of Lasher as defendants in this case.

(1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id*.

On a motion for summary judgment, I consider the facts in the light most favorable to Plaintiff as the non-moving party, drawing all justifiable inferences in his favor. *Ricci v. DeStefano*, 557 U.S. 557, 585–86 (2009); *George & Co., LLC v. Imagination Entm't Ltd*., 575 F.3d 383, 391–92 (4th Cir. 2009); *Titan Indem. Co. v. Gaitan Enters., Inc*., No. PWG-15-2480, 2016 WL 6680112, at *1 (D. Md. Nov. 14, 2016).

## DISCUSSION

### Claims Against Carla Buck, R.N.

Blankumsee faults Buck for medically approving his placement in an isolation cell without medical justification and at the request of correctional officers. Compl. 3. He views her actions as violations of the Eighth Amendment's prohibition of cruel and unusual punishment.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone,* 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

> Deliberate indifference is a very high standard – a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of

7

rights, not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments.

*Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center,* 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris,* 240 F.3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998)) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

In the affidavit that Buck filed in support of her motion for summary judgment, she asserts that when prison custody officers suspect "an inmate . . . of having contraband inside of his or her body, the inmate is placed in SOH where the inmate can be observed twenty-four hours per day to prevent the inmate from destroying or discarding the contraband."  Buck Aff. ¶ 6, ECF No. 14-5.  Before an inmate is placed in SOH, a member of the medical staff evaluates the inmate "to ensure that the inmate is medically cleared to be housed in SOH."  *Id.* ¶ 7.  Buck insists that medical staff members "do not determine when to place an inmate in SOH or the length of time the inmate stays in SOH."  *Id.* ¶ 7.  Rather, [t]hose decisions are made solely by prison correctional staff."  *Id.*   As a member of the prison medical staff, Buck's "sole responsibility" was "to ensure that the inmate was medically cleared to be housed in SOH." *Id.*

Buck states that on August 2, 2015, she saw Blankumsee "for a wellness check to determine whether Plaintiff was medically cleared to be housed in SOH due to possible contraband in his rectum."  *Id.* ¶ 8; *see also* Aug. 2, 2015 Med. Rec., ECF No. 14-4.  She "did not see or treat Blankumsee at any other point during the timeframe relevant to Plaintiff's Complaint." Buck Aff. ¶ 10.  On August 2, 2015, Buck "noted that Plaintiff was alert and oriented," his "vital signs . . . were all within normal limits," and he "appeared . . . to be in no distress."  *Id.* ¶ 8.  She also noted that Blankumsee's medications included vitamins, allergy medication, and topical medications.  Aug. 2, 2015 Med. Rec.  Notably, the Medical Record did not indicate that Blankumsee had any mental health issues, and it did not list any psychotropic medications.  *See id.*  Buck determined, "based on her professional nursing experience, training and clinical judgment," that Plaintiff was medically fit to be housed in SOH." Buck Aff. ¶¶ 9-10.

Buck argues that "Plaintiff has simply presented no admissible evidence to establish that Nurse Buck consciously disregarded a substantial risk of serious harm."  Buck Reply 6.  Yet,

Blankumsee cites "Division of Correction Directive ['DCD'] 110-4," which requires that, "[p]rior to placement in isolated confinement, the inmate shall be evaluated by a health care provider/mental health professional in order to determine if the inmate is suffering from a mental or medical disorder," and provides that "[t]he isolation confinement area shall not be used for inmates suffering from mental disorders." DCD 110-4, ¶¶ VI.B.2, D, Pl.'s Decl. Ex. 1, ECF No. 36-1; *see* Pl.'s Opp'n to Buck Mot. 1-2.  He also offers evidence in the form of a March 4, 2016 treatment history in which M. Gordon, MS, NCC, LCPC stated that Blankumsee "participated in the initial mental health intake on 7/10/15"; his mental health diagnosis was "Obsessive Compulsive Disorder[,] Anxiety Disorder, NOS [Not Otherwise Specified,] and Impulse Control Disorder"; and he took psychotropic medications.  Pl.'s Opp'n to Buck Mot. Ex. A, ECF No. 16-1.  Buck does not refute this evidence; she simply maintains that her role was to ensure that he was "*medically* cleared to be housed in SOH."  Buck Reply 3–4.

Thus, it is undisputed that Plaintiff had multiple mental disorders, which could qualify as objectively serious medical conditions,[2] at the time Buck evaluated him, and she did not note any of these disorders on the Medical Record.  And, it is undisputed that inmates with mental disorders were not supposed to be placed in isolation cells.  Moreover, DCD 110-4 outlines a procedure for repeated observation and evaluation of the mental health of any prisoner placed in an isolation cell to prevent "continued isolation confinement" under circumstances in which it "is detrimental to the inmate."   DCD 110-4 ¶ VI.E, H.   Thus, placing an inmate with mental disorders in isolation could constitute disregarding a substantial risk of serious harm.

---

[2] Indeed, the note "suicide" appears in the observation logs from Blankumsee's time in SOH, and he was given a "suicide smock" while in SOH.  Observation Logs, State Defs.' Mem. Exs. 10, 11, ECF Nos. 27-13, 27-14.

Even so, to be liable, Buck would have to have had "knowledge both of the general risk," and that giving Plaintiff medical clearance was "inappropriate in light of that risk." *See Rich*, 129 F.3d at 340 n.2.  Certainly, it is undisputed that Buck only assessed Blankumsee this one time, for which her "sole responsibility" was "to ensure that the inmate was *medically* cleared to be housed in SOH."  But, on the record before me, I cannot determine whether Buck inquired about Blankumsee's mental health or had access to his mental health records.  Moreover, it is unclear whether Buck was supposed to take his mental health into account in her medical evaluation, as opposed to leaving it for a mental health professional to address in a separate assessment.  Therefore, Buck's motion will be denied without prejudice to refiling a motion for summary judgment that includes additional evidence about the scope of Buck's role.

**Claims Against the State Defendants**

Blankumsee asserts that Defendants violated the Eighth and Fourteenth Amendments through their conduct.  It appears that Blankumsee, a self-represented plaintiff, alleges claims of conditions of confinement and inadequate medical treatment, loss of property, retaliation, equal protection, and discrimination.  The State Defendants filed declarations, Blankumsee's infraction hearing records, portions of his medical and psychological records, and relevant ARP requests in support of the motion for summary judgment.  ECF Nos. 27-4 – 27-31.  They argue that Blankumsee's allegations fail to support cognizable federal claims, and they raise, *inter alia*, failure to exhaust administrative remedies and respondeat superior as affirmative defenses. And, they claim entitlement to qualified immunity.

### A.  *Respondeat Superior*

Liability is imposed under § 1983 on "any person who shall subject, or cause to be subjected, any person . . . to the deprivation of any rights . . . ." 42 U.S.C. § 1983. The statute

11

requires a showing of personal fault, whether based upon the defendant's own conduct or another's conduct in executing the defendant's policies or customs. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 (1978); *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (in order for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, it must be "affirmatively shown that the official charged acted personally in the deprivation of the plaintiffs' rights") (quoting *Bennett v. Gravelle*, 323 F. Supp. 203, 214 (D. Md. 1971), *aff'd*, 451 F.2d 1011 (4th Cir. 1971)). Moreover, an individual cannot be held liable under 42 U.S.C. § 1983 under a theory of *respondeat superior*.[3] *See Monell*, 436 U.S. at 690; *Love–Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (noting that "there is no *respondeat superior* liability under § 1983"); *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984) (stating that liability of supervisory officials "is not premised on *respondeat superior*").

In a § 1983 action, liability of supervisory officials "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan*, 737 F.2d at 372). Supervisory liability under § 1983 must be supported with evidence:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices," and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted).

---

[3]   *Respondeat superior* is a legal doctrine that holds that, in some circumstances, an employer is responsible for the actions of employees performed within the course of their employment.

Blankumsee does not address this defense in his Declaration.   Moreover, he does not claim that Warden Graham was personally involved in the matters alleged. Nor does he provide evidence on which a factfinder could find Graham liable under principles of supervisory liability. Accordingly, Graham is entitled to summary judgment in his favor as a matter of law.  *See Shaw*, 13 F.3d at 799; *Vinnedge*, 550 F.2d at 928.   But, he alleges that each of the other State Defendants personally seized his property or subjected him to inhumane conditions, and therefore this defense is not available to them.  *See Shaw*, 13 F.3d at 799; *Vinnedge*, 550 F.2d at 928.

### B.  Exhaustion of Remedies

The State Defendants assert that Blankumsee's claims, "with the exception of plaintiff's claims regarding his property and being housed in HU #3, C-Tier," have not been properly presented through the administrative remedy procedure and must be dismissed pursuant to 42 U.S.C. § 1997e. State Defs.' Mem. 28–29.  Section 1997 of the Prisoner Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . , or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."   42 U.S.C. § 1997e(a).   For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The PLRA's exhaustion requirement serves several purposes.  These include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones v. Bock*, 549 U.S. 199, 219 (2007); *see Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (noting that exhaustion means providing prison officials with the opportunity to respond to a complaint through proper use of administrative remedies).  It is designed so that prisoners "pursue administrative grievances until they receive a final denial of their claim, appealing through all available stages in the administrative process." *Chase v. Peay,* 286 F. Supp. 2d 523, 530 (D. Md. 2003); *see also Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief").

Exhaustion is mandatory and therefore, a court ordinarily may not excuse a failure to exhaust.  *Ross v. Blake*, --- U.S. ----, 136 S. Ct. 1850, 1856–57 (2016) (citing *Miller v. French,* 530 U.S. 327, 337 (2000) (explaining that "[t]he mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion")); *see Jones*, 549 U.S. at 220.  And, typically, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore*, 517 F.3d at 725, 729.  Yet, the court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp,* 458 F.3d 678, 684 (7th Cir. 2006).

An inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a).  *In Ross,* 136 S. Ct. at 1855, the Supreme Court reiterated that "[a] prisoner need not exhaust remedies if they

14

are not 'available.'" *Id.* at 1855.   The Fourth Circuit addressed the meaning of "available"

remedies in *Moore*, 517 F. 3d at 725, stating:

> [A]n administrative remedy is not considered to have been available if a
> prisoner, through no fault of his own, was prevented from availing himself of
> it.  *See Aquilar-Avellaveda v. Terrell,* 478 F. 3d 1223, 1225 (10th Cir. 2007);
> *Kaba v. Stepp*, 458 F. 3d 678, 684 (7th Cir. 2006). Conversely, a prisoner does
> not exhaust all available remedies simply by failing to follow the required
> steps so that remedies that once were available to him no longer are.  *See*
> *Woodford v. Ngo,* 548 U.S. 81, 89 (2006).  Rather, to be entitled to bring suit
> in federal court, a prisoner must have utilized all available remedies "in
> accordance with the applicable procedural rules," so that prison officials have
> been given an opportunity to address the claims administratively. *Id.* at 87.
> Having done that, a prisoner has exhausted his available remedies, even if
> prison employees do not respond.  *See Dole v. Chandler*, 438 F.3d 804, 809
> (7th Cir. 2006).

In *Ross,* the Supreme Court explained that an administrative remedy is available if it is

"'capable of use' to obtain 'some relief for the action complained of.'" 136 S. Ct. at 1859

(quoting *Booth,* 532 U.S. at 738). Thus, an inmate must complete the prison's internal appeals

process, if possible, before bringing suit.  *See Chase*, 286 F. Supp. 2d at 529-30. As a prisoner,

Blankumsee is subject to the strict requirements of the exhaustion provisions. *See Porter v.*

*Nussle*, 534 U.S. at 528 (no distinction is made with respect to exhaustion requirement between

suits alleging unconstitutional conditions and suits alleging unconstitutional conduct).

Exhaustion is also required even though the relief sought is not attainable through resort to the

administrative remedy procedure.  *See Booth*, 532 U.S. at 741.

Exhaustion requires completion of "the administrative review process in accordance with

the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93

(2006).  The Supreme Court has outlined three circumstances when an administrative remedy is

unavailable and an inmate's duty to exhaust available remedies "does not come into play." *Ross*,

136 S. Ct. at 1859.  These are: (1) when the remedy operates as a "simple dead end-with officers

15

unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when the administrative scheme is so "opaque" as to be "practically speaking, incapable of use"; and (3) when prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 1859–60.

The Department of Public Safety and Correctional Services ("DPSCS") has made an "administrative remedy procedure" ("ARP") available to Maryland State prisoners for "inmate complaint resolution." *See generally* Md. Code Ann., Corr. Servs. §§ 10-201 *et seq*.; Code Md. Regs. 12.07.01.01B(1) (defining ARP). The grievance procedure applies to the submission of "grievance[s] against . . . official[s] or employee[s] of the Division of Correction." Corr. Servs. § 10-206(a).

Judge Hollander provided a thorough description of the process in *Aurel v. Mailroom North Branch*, noting that "[a]n inmate 'must exhaust' the ARP process as a condition precedent to further review of the inmate's grievance." No. ELH-14-2813, 2016 WL 3957647, at *7–9 (D. Md. July 21, 2016) (quoting Corr. Servs. § 10-206(b); citing Code Md. Regs. 12.07.01.02.D; DCD 185-002 (effective Aug. 27, 2008)). To exhaust the ARP process, the inmate must "complet[e] . . . 'the administrative review process in accordance with the applicable procedural rules, including deadlines.'" *Id.* at *7 (quoting *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006)).

In DOC facilities, such as WCI, a prisoner must follow a three-step institutional ARP process.[4] *Id.* at *8 (citing Corr. Servs. § 10-206(b); OPS.185.0002.02).[5] First, a prisoner must

---

[4] The exceptions to this institutional exhaustion requirement are not relevant here. They include complaints about case management decisions, complaints about "Maryland Parole Commission procedures and decisions to withhold mail," claims related to the Prison Rape Elimination Act, and complaints relating to procedures for prisoner disciplinary proceeding and the decisions reached following such proceedings. *Id.* at *8–9 (citing OPS.185.0002.05F(1), (2),(4),(5), OPS.185.0002.05C(3)). Additionally,

file an ARP request with the warden "within 30 days of the date on which the incident occurred, or within 30 days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later." *Id.* (citing OPS.185.0002.05C(1); DCD # 185-003VI; Code Md. Regs. 12.07.01.05A). Second, if the warden denies that request, "the prisoner has 30 days to file an appeal with . . . the Commissioner of Correction." *Id.* (citing OPS.185.0002.05C(2); DCD # 185-004VI). Third, "[i]f the Commissioner of Correction denies an appeal, the prisoner has 30 days to file a grievance with the IGO [Inmate Grievance Office]." *Id.* (citing OPS.185.0002.05D; Corr. Servs. §§ 10-206(a), 10-210; Md. Code Regs. 12.07.01.05B; DCD 185-002, § VI(N)(1)). If the grievance filed with the IGO "is determined to be 'wholly lacking in merit on its face,' the IGO may dismiss it without a hearing." *Id.* (quoting Corr. Servs. § 10-207(b)(1)).

> An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of Administrative Hearings. *See* C.S. § 10-208(2)(c); COMAR 12.07.01.07–.08. ...
>
> A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination. C.S. § 10-209(b)(1)(i) & (ii); COMAR

---

> [w]hile a prisoner may pursue the ARP process to allege that correctional officers used excessive force, such ARPs may be procedurally dismissed if the Internal Investigations Division ("IID") has decided to conduct an investigation into the use of force incident at issue in the ARP. OPS.185.0002.05.E(6) & K(3)(e). If this procedural dismissal indicates that no further action may be taken through the ARP process, a prisoner may then file a grievance directly with the IGO, as there would be no further administrative remedies available through the ARP process. [C].S. § 10-206(b).

*Id.* at *9.

[5] "OPS.185.0002 is an Executive Directive created by the Maryland Department of Public Safety and Correctional Services." *Aurel*, 2016 WL 3957647, at *7 n.8 (noting that the Directive appears at ECF No. 16-2 in *Payton v. Bishop*, No. ELH-15-3648); *see* Fed. R. Evid. 201(b)(2) (permitting judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

> 12.07.01.10A. However, a decision concluding that the inmate's complaint is
> wholly or partly meritorious constitutes a recommendation to the Secretary of
> DPSCS, who must make a final agency determination within fifteen days after
> receipt of the proposed decision of the administrative law judge. *See* C.S. § 10-
> 209(b)(2), (c).

*Id*. The administrative exhaustion requirement then is satisfied, even though the prisoner may choose to (but need not) appeal to Maryland state court. *Id*.

Sgt. Thomas Menges, WCI's ARP Coordinator, explained in his declaration that all of the ARP requests received by the ARP Office, "including those from Mr. Blankumsee, are logged and investigated." Menges Decl. ¶ 2, ECF No. 27-20. According to the State Defendants, Blankumsee filed twenty-seven ARP requests between August 2, 2015 and December 30, 2015, but only ten pertained to claims in this case. State Defs.' Mem. 13 & n.9; *see also* Pl.'s ARP Index Rept. 2–4, ECF No. 27-19. Blankumsee does not dispute this assertion. *See* Pl.'s Decl. Of those ARP requests, Blankumsee withdrew one (ARP #1303-15) in which he alleged that "Ofc. Heavener and Ofc. Frazee pulled the soles out of his shoes and acted unprofessionally towards him" on August 2, 2015, Menges Decl. ¶ 3; Withdrawal Form, ECF No. 27-21 (acknowledging that "failure to exhaust the administrative remedy procedure by withdrawing [the ARP] request may result in dismissal of [the] complaint at a higher level"), and he withdrew a second (ARP #1312-15) in which he alleged that "Ofc. Heavener singled him out, antagonized him and placed his handcuffs on too tight," and that "Ofc. Heavener and Ofc. Frazee destroyed his shoes," Menges Decl. ¶ 3; Pl.'s ARP Index Rept. 3; Withdrawal Form, ECF No. 27-25 (acknowledging that "failure to exhaust the administrative remedy procedure by withdrawing [the ARP] request may result in dismissal of [the] complaint at a higher level"). Because he withdrew these claims, he failed to exhaust them. *See Aurel*, 2016 WL 3957647, at *7–9.

Additionally, he failed to appeal four of the eight remaining relevant determinations, Pl.'s ARP Index Rept. 2–3, thereby failing to exhaust them either.  *See Aurel*, 2016 WL 3957647, at *7–9. In one (ARP #1305-15), he complained that, in violation of his rights under the Eighth Amendment, he was left naked in a SOH without a mattress or water with the air conditioner on for seventeen hours, during which time he suffered several panic and anxiety attacks and several women correctional officers were allowed to see him naked.  Aug. 7, 2015 ARP Req. 2, ECF No. 27-23.  In a second (ARP #1330-15), Blankumsee alleged that he experienced discrimination and Eighth Amendment violations when, beginning on August 4, 2015, he was housed in cell  HU 4-A-27 for six days with the windows sealed shut, conditions unlike those that other inmates experienced.  Aug. 11, 2015 ARP Req. 2, ECF No. 27-26.  In a third ARP request (ARP #1374-15), Blankumsee complained of constitutional violations, based on the ARP coordinator's allegedly improper review of two other ARP requests, No. WCI-1311-15 and WCI-1330-15. Aug. 19, 2015 ARP Req. 2, ECF No. 27-27.  And, in a fourth (ARP #1376-15), Blankumsee complained that Nurse Buck improperly cleared him for SOH placement on August 2, 2015. Aug. 19, 2015 ARP Req. 2, ECF No. 27-28.

Blankumsee saw four other ARP requests through to appeal, and for two of them, Blankumsee filed grievances with the IGO. They addressed his loss of property and his conditions of confinement on HU #3, C-Tier. The State Defendants concede that Blankumsee has exhausted these claims.  State Defs.' Mem. 29.  With regard to his other claims, Blankumsee does not dispute the State Defendants' assertion that he failed to exhaust his remedies or claim that the administrative remedy process was unavailable to him.  It bears noting that Blankumsee repeatedly accesses the ARP process and is no stranger to its procedures.  Between February 10, 2010 to April 11, 2016, Blankumsee filed eighty-one ARP requests. Pl.'s ARP Index Rept.  In

sum, with the exception of Blankumsee's claims for loss of property and the conditions of his housing in HU #3, C-Tier, his claims are unexhausted.

## C.  Property Claims

Blankumsee generally faults defendants for his purported loss of property after it was inventoried without him present. Yet, other than claiming that Officer Frazee destroyed his shoes (a claim for which he failed to exhaust his administrative remedies), Blankumsee does not allege in the complaint that any State Defendant was personally involved in the inventory or seizure of his property.

As for his personal property, even if a plaintiff "has been deprived of property under color of state law," there is no due process violation if "the deprivation did not occur as a result of some established state procedure" and "'an adequate state remedy'" exists to redress, post-deprivation, any "'property damage inflicted by state officers.'"  *Parratt v. Taylor*, 451 U.S. 527, 542–44 (1981) (quoting *Bonner v. Coughlin*, 517 F.2d 1311, 1319 (7th Cir. 1975)), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986); *see also Juncker v. Tinney*, 549 F. Supp. 574, 576 (D. Md. 1982) ("[I]f plaintiff has an adequate post-deprivation remedy in state court, that should satisfy the requirements of due process and plaintiff should not be permitted to bring a s 1983 claim in federal court.").  The Supreme Court extended its *Parratt* holding to intentional deprivations of property. *See Hudson v. Palmer,* 468 U.S. 517, 533 (1984).

Blankumsee does not allege that the deprivation occurred due to an established state procedure.  And, "Plaintiff may seek relief through the Maryland[] Tort Claims Act and the Inmate Grievance Office."  *Mcclain v. Shell*, No. JFM-09-3053, 2010 WL 4485896, at *2 n.2 (D. Md. Nov. 9, 2010).  This "right to seek damages and injunctive relief in Maryland courts constitutes an adequate post-deprivation remedy."  *Id.* at *2.  Thus, to the extent that Blankumsee

alleges that his personal property was improperly taken, he fails to state a constitutional claim. *See Parratt*, 451 U.S. at 542–44; *Mcclain*, 2010 WL 4485896, at *2 & n.2; *Juncker*, 549 F. Supp. at 576.

To the extent Blankumsee may allege legal materials were lost, he does not allege injury sufficient to state a denial of access to the courts claim. Prisoners have a constitutionally protected right of access to the courts.  *See Bounds v. Smith*, 430 U. S. 817, 821 (1977).  However,

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims.  The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.  Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis v. Casey*, 518 U.S. 343, 355 (1996) (emphasis removed).  "Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'"  *O'Dell v. Netherland*, 112 F.3d 773, 776 (4th Cir. 1997) (quoting *Lewis*, 518 U.S. at 355).  "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis*, 518 U.S. at 349.  Actual injury occurs when a prisoner demonstrates that "the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim."  *Id*. at 351.  Blankumsee does not allege that he missed court filing deadlines or suffered "actual injury" to support a denial of access to the court claims.  *See id.*

Viewing the facts in the light most favorable to Blankumsee, there are no genuine issues of material fact in dispute as to his personal property and access to courts claims.  Indeed, an ALJ has determined that Blankumsee is entitled to compensation for some of his lost property. Accordingly, summary judgment will be entered in favor of the State Defendants as to these claims.

### D.   Conditions of Confinement

Blankumsee alleges that on August 19, 2015, he was moved to HU #3, Cell #32, where he was discriminated against by being denied the same rights and privileges as general population inmates such as participation in activities, recreation, library and law library.  Compl. 5.   Blankumsee states that he also was denied participation in jobs and programs to earn diminution of confinement credits subjecting him to a prolonged confinement. *Id.*

Conditions that "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment.  *Rhodes v. Chapman*, 452 U. S. 337, 347 (1981). However, conditions that merely are restrictive or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society." *Id.*   To establish that he has experienced cruel and unusual punishment, "a prisoner must prove two elements—that 'the deprivation of [a] basic human need was *objectively* "sufficiently serious,"' and that '*subjectively* "the officials act[ed] with a sufficiently culpable state of mind."'" *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original) (quoting *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991))). "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions."  *Strickler*, 989 F.2d at 1381.

22

On August 20, 2015,[6] Blankumsee moved into Cell 3C32B after he completed fifteen days of disciplinary segregation that a hearing officer had imposed.  His transfer to the new cell was "in accordance with WCI ID 230.004.1 Appendix 2 (WCI Housing Unit Level System Plan) Section III," which requires that inmates recently released from disciplinary segregation be assigned to the C Tier. Winters Decl. ¶ 7; *see also* Housing Directive 4, ECF No. 27-17.  Inmates on this tier, including Blankumsee, have modified movement. Winters Decl. ¶ 7.  Blankumsee acknowledges that he was allowed two hours of recreation daily. Appeal & Resp., ECF No. 27-30.  This was more than the required amount of recreation on the tier.  *Id.*; C-Wing Mem. 1, ECF No. 27-18; Winters Decl. ¶ 7.  Inmates on this tier, including Plaintiff, were also permitted "library privileges [and] inmate job opportunities." Winters Decl. ¶ 7; *see also* C-Wing Mem. 3. Blankumsee fails to establish that he was subject to serious deprivation or that any of the State defendants acted with a sufficiently culpable state of mind to establish an Eighth Amendment claim. Contrary to Blankumsee's assertions that he was placed on this tier in retaliation for filing ARPs, with unlawful discriminatory animus, or in violation of his right to equal protection under law, his assignment was required by institutional prisoner management policies. While Blankumsee's movements and recreational time may have been more restricted than those of general population inmates, he enjoyed the same opportunities and privileges as other inmates on the tier.  On October 2, 2015, he was removed from this tier and housed in cell 3A26B.   Because there are no genuine issues of material fact at issue, I will grant the State Defendants' motion for summary judgment as to this claim.

Havign already granted summary judgment to the State Defendants for the reasons stated above, it is not necessary for me to address their claims of qualified immunity.

---

[6] Winters' Declaration contains a typographical error.  It states the date of the move to cell 3C32B was on August 20, 2016, rather than August 20, 2015.  Winters Decl. ¶ 7.

**CONCLUSION**

Accordingly, I will treat Buck's motion, ECF No. 14, as one for summary judgment and deny it without prejudice to refiling a motion for summary judgment that includes additional evidence about the scope of Buck's role, and I will treat the State Defendants' motion, ECF No. 27, as one for summary judgment and grant it.  A separate order follows.


March 15, 2017                          _____/S/_____
Date                                    Paul W. Grimm
                                        United States District Judge